This is Monex, Mr. Groteiner. Mr. Groteiner, are you ready? Good morning, Your Honors. The Commission's actions and arguments fly in the face of Dodd-Frank, Section 742. It would help me if you could just explain very simply a kind of typical transaction that Monex engages in that is troubling the government here. Well, I'm not sure exactly what's troubling the government, but a typical transaction is a customer calls on the phone, says, I would like to buy precious metals under the Atlas program. I'd like it to be leveraged. I'll put down 20%. And he sends in his money. He will have signed an agreement already. Monex takes the trade and the delivery is made to the depository within 28 days, usually less than that, and actual delivery is made. And then a notice of transfer of title is sent to the client. The trade is done. And there is a security interest consistent with the model code that exists and that the customer also signs. That's how it works. So the customer's bought gold and this gold is in a depository of some sort. And then what? It doesn't just... Well, it sits there. The customer may want to speculate. Yeah, but now what can the customer now do? The customer can have it delivered, can pay off the amount of the loan, have the metal delivered. The customer can buy another metal. The customer can do several things. But typically the customer doesn't get the gold delivered to him. He can. I know, but that's not typical. I'm asking about the typical transaction. We're talking about the leverage Atlas program, which is when you purchase on leverage or margin and the customer can buy more metal that the customer wishes. That's the way it works. Or the customer, as I've already said, can pay off the loan and have it sent to him or sent to another depository or keep it in the depository. If every customer demanded delivery simultaneously, could Monex deliver? Yes. In fact, that's... I assume if the response to the subpoena shows that, the CFTC will go away. The inquiry, logically, given what the CFTC's charge is, is whether that's true or whether instead Monex is effectively engaging in fractional reserve banking. No, that's not what they say. On page 27 of the transcript before Judge Shanker, Judge Shanker said to Mr. Metzger, the CFTC attorney, you're not suggesting the metal isn't there and you're not suggesting this is a Hunter Weiss situation. What you're saying is because of the rights that exist between the customer and Monex, that is that the customer has to pay off the money, the loan, before he gets the metals, that means there's constructive possession. That's your argument, isn't it? And he said that is correct. That was on page 27. So they have admitted that there's not one instance, not one shred of evidence that there's any problem in making delivery. That's not what this case is about. What this case is about, as they've made it really clear, is that they are now trying to do a back end run after Congress specifically told them no to your suggestion that we eliminate the collateralized delivery to a depository. That is what they're fighting about. Congress said no, you can't have that. We're going to go pursuant to the model code. And not only that, Your Honors, but there is no doubt in the informal guidance that the CFTC understood precisely what Dodd-Frank said. In footnote 12 of the invitation to everyone to make comments on the new rules for actual delivery, the CFTC cited the Congressman Marshall's comments about what they were trying to do. And this all flowed from the Zellner fix. They were unhappy with the Zellner case and they wanted to fix it, and they came up with a new provision, which they called Dodd-Frank. But in the informal guidance, the CFTC made it absolutely clear that in order to figure out what actual delivery is or what delivery is, you look at the word actual and you look at the legislative history. They already cited to Marshall's comments about what we're trying to do. Marshall made it absolutely clear on page 81 and page 88 of the supplemental appendix, which is a copy of the congressional record. He made it absolutely clear, look, according to what you're saying, Monex is doing it the right way, so let Monex do what they're doing and you go after the Ponzi schemes. And then on page 88, which we quoted, he said the minimal burden on Monex. Look, we're not trying to decide Monex's liability. We're trying to decide a subpoena enforcement proceeding. That's correct. We're going to decide both of them under the statute rather than under readings from the congressional record. Absolutely. I'm just saying that CFTC advises us to look at that hearing at the congressional history to understand what the actual delivery means. And there is no doubt what actual delivery means because they've adopted the model code. That's what the CFTC did. The government says in its brief that the customers have no rights to the disposition of the metal in the depositories. Monex retains the right to dispose of the metal at any time, notwithstanding its finance sales to retail customers. Is that accurate? It is accurate that there's a demand feature, but the CFTC already opined on that. The CFTC said in 2013 in the Wirth case that there is nothing violative of actual delivery based on what Wirth was doing. Wirth had the same provisions. In fact, the CFTC admits that there are similarities. They have the same provisions in their contract that Monex had. And Judge Reiskamp pointed out to the CFTC in a decision that was I don't understand what the significance of this is. It's common for agencies to change position all the time. You surely can't be saying that every time an agency changes its legal position, it loses the right to enforce subpoenas. Absolutely not. We have never said that. I don't understand why you think it's significant that some years ago they had a different legal position. Because they've adopted it after Dodd-Frank. Dodd-Frank said this is what it means. Look, agencies with the Supreme Court has said many times that agencies with some interpretive discretion are entitled to change their opinions. That's why I just don't see why it matters that they had a different opinion. If your position is the statute is unambiguous, then you ignore their opinion from 2013 and their opinion now and we apply the statute. If your position is that the statute is ambiguous, then the agency can change its view. Our position is, Your Honor, that the statute is unambiguous. Then it doesn't matter what the agency said some time ago. Your Honor, there are two approaches here. I'm not going to presume to tell you what Sidley Austin means. The judge below did an analysis of Sidley Austin. The question is, what was the purpose of the statute? Under Sidley Austin, there is a provision for bifurcation. We're interested in what is the meaning of the statute, not what is the purpose of people who enacted the statute. Sidley Austin talks about the purpose. Sidley Austin says meaning and purpose. The purpose of this statute was absolutely clear. The purpose informs the meaning. And according to Congressman Marshall, who they quote, and they direct everyone to, Congressman Marshall said that it's very clear what we're trying to do. We're trying to stop scammers who don't have the metal in the depository. And they have stipulated that the metal is in the depository, Your Honor. Therefore, under the teaching of Sidley Austin, at worst there should be a bifurcated hearing. It really, Your Honors, could decide that as a matter of law, because there are no factual disputes here, none, with respect to whether the metal is delivered, you could decide under Sidley Austin that at least it should be bifurcated. And that is, we respectfully suggest, plan B here, that it should be no more than that. Because what they're doing is, and they're specifically violating Zellner, they've tried to make a fraud case. And then they've also tried to argue that this is for the protection of everyone. Zellner said absolutely not. Just because there are remedies under the CEA, one doesn't proceed with the assumption that the CEA, there's jurisdiction. And also, you cannot allege a fraud somehow to get jurisdiction. So, Your Honor, I respectfully disagree. Again, I hate what Sidley Austin means. But under Sidley Austin, if you have the purpose and the meaning, as we do here in a highly unusual and specific way, which was only to deal with actual delivery in the depository, if the metals are there, and they stipulate that the metals are there, then it's clear under congressional history that actual delivery has occurred, period. So I want to ask you about the subpoena and problems with compliance with the subpoena. You know, what would actually threaten, why would it actually threaten the normal operation of the business? In other words, how would it drain employee resources complying with the subpoena? It would not. And we've never suggested it would. But the problem is, the CFTC has repeatedly made it... First of all, they can publicize this information. Well, what basis, what belief do you have that it would publicize it when that would be against the law? No, they're entitled, they can do investigations and publicize information they collect. But more importantly, what I'm concerned about is that this is an organization, which has reversed itself, it can do it, but it's reversed itself with no basis, and they are saying in papers that the metal isn't there, they're saying this is a fraud on thousands of people, they're saying it's getting worse. They have specifically misquoted the advertising materials to tell this court that Monix said untrue things to people. This is an agency. Presumably, your response to the subpoena will show that that's incorrect. We already have, Your Honor. That's why it's so puzzling that you're resisting compliance and saying we're entitled to keep secrets. Your Honor, we're entitled to do what anyone else would in a competitive market. The CFTC has been quite clear that how customers track records are not public information. They are irrelevant. And what they want is Monix track records, by the way, in a series of down-trending years, they wanted Monix's track record, and it has no bearing on actual delivery, how Monix's customers did, period. And nor have they ever suggested in any coherent way how it has any bearing. They have given no explanation, which also runs right into the teeth of Zellner. If the agency has no explanation for its argument, then it shouldn't be given any credit, and it should be given no deference. And here, Judge Easterbrook, where they have specifically flipped, and now they're saying the exact opposite of what they said in their pronouncements, they're entitled to no deference. This defines capricious and arbitrary conduct. And we would respectfully submit, and I'd like to take my leave at this point to save a little time for rebuttal, we respectfully submit that this is an iconic situation where Sidley at least should apply, at least send it back to Magistrate Shanker, let him see the Worth analysis, which they hid from him. Let him see that the Worth court said the one unpublished opinion that they would not show, the magistrate judge, let them see that Judge Shanker said to the CFTC, with your interpretation of Hunter Weiss, you would nullify the Dodd-Frank exemption. That I will not allow. And that's exactly what they're doing. So let me ask you this. You can't file a protective order. You said the CFTC could publish basically everything about the investigation. You couldn't file a protective order to prevent that? Your Honor, there's no certainty. I don't know what they're going to do. But you have the power to do that, file a protective order. Your Honor, I could try and file a protective order, but I just want to do one other thing before I sit down. But that's not the point. The point is, as Judge Marshall said, this is going to be a minimal burden on Monarchs. We're not after you. In fact, Your Honor, you should know something. Actual delivery, that phrase in the statute, it doesn't come from the model code. Actual delivery was in Monarchs' account agreements. And Congressman Marshall had met with Monarchs and the head of the NFA the day before, and they used Monarchs' term. And it's clear when Congressman Marshall said, we want minimal burdens on you. You do it the right way. Your Honor, I respectfully submit, this is not minimal burdens. And Judge Easterbrook, that's another point. Monarchs was the model. Monarchs followed the model code. So they completely flipped themselves. And to really nail down this point, if you look at the Worth case, and I'd like to direct you to Docket 67, which is Exhibit 7, and it's also part of Ben Guidler's declaration. What would be involved in your responding to the subpoena? I'm sorry? What would be involved in responding to the subpoena? We've responded to it, Your Honor. We've already responded to it. We've provided just about everything. In fact, we've provided everything they wanted, and we're trying to get some of it back. The only contention was we put subpoena. I don't understand. You responded to the subpoena. You provided them what they wanted, and now you want it back? I want some of it back. What does that mean? You have it. Anything you gave them, you have. We don't want them using it. This is not moot. They have it. We want some of the documents. We want some of the material back by which they're figuring out. So it's not a question of the burden on you. Burden is the way that what they're doing. They're continuing the investigation, and what they're doing and what they're threatening to do. So it's the investigation you disapprove of. It's not the burden of answering the subpoena. We asked for a motion to stay. It was denied. We responded to it. And therefore, now we're entitled to get those materials back if this court agrees with us, and that they're not entitled to it. But they've looked at them already. So what? They looked at them. Pardon? That doesn't matter to us. They looked at them. You know, that often happens. Well, if that doesn't matter to you, why do you want it back? We don't want them to use it in any fashion whatsoever. And we want any information they have. But that's different from objecting to the subpoena. I mean, you gave them all this stuff. They have it. They could give it back to you after making copies of it. How would you be benefited by getting this stuff back? The court could say, give all copies back. What does it mean to get it back? I'm sorry? You just send them information. I'm sorry? They have the information. What is it they're returning? I don't get it. The information that we sent them. They're just returning. They give it back to us in all copies. Yeah, but they're going to keep a copy of it, aren't they? No, they won't. Not if the court orders you. Say, you weren't entitled to this. The monarchs made a motion for a stay. But you want an injunction against them? Is that what you're saying? No, just a simple order. What the court has done before, in subpoena action. Well, that's an injunction. You're going to say they can't use anything they learned. That's correct. They cannot. No, not anything. Quite the contrary. We want them to use almost everything to finish their delivery investigation. So you want an injunction against their using certain... Track record information of customers, which is absolutely irrelevant to what they claimed their investigation was. Why do you care? Because it's irrelevant. It must be damaging material in that. You wouldn't bother with a lawsuit. Your Honor, the point is we don't know. We put it in the papers. We don't know what competitors, how competitors' customers do. You know, I've got to say this. So we're back again to the protective order. All you have to do is ask for a protective order. Let it not be disclosed to anybody. Your Honor, we can do that, but they intend to use it. That is the heart of what they're doing now. No, no, no. A protective order prevents them from sharing it from some competitor. You go back to that. But what they'll do is they will file a pleading, which will have the information in it, and the reason why we're concerned about it is that it's well known in this country that most commodity investors lose money. Some have said up to 90%. However, because it's important in this country for there to be both a hedging and speculative side of the market. And then in that case, if they file the complaint, you could ask that it be kept under seal. Your Honor. My caution is that that could be done if they ended up getting to that point. That's also possible. I mean, I assume we could do that. How it would work in practice, I'm not positive. I know there's been debates about it. Well, how it would work in practice, you'd file the motion, the judge would rule, and then the complaint would be filed under seal. Maybe it would. And there would be instructions in the clerk's office not to give up anything. I mean that. Maybe it would. Maybe it isn't. As Your Honor knows, the district courts have been resisting filing material under seal. They're really inveighing against it. So we don't know what would happen. And to answer your question, the reason why it's important is because the CFTC and Congress has made it real clear that as long as you don't represent how your customers do, you don't have to disclose. FCMs don't have to disclose. It makes your company look terrible. No, we don't know. No. It does. How does it make it look terrible? You're trying to hide stuff. Your Honor. That doesn't look good, even if you have a right to hide. It's not, as Judge Williams was pointing out, you can be protected against your competitors taking advantage of this. But to keep it from the, to want to snatch it back from the government after you've given it to them? Well, that's permitted under the law. It doesn't look good. It doesn't look good for your company. Your Honor. It doesn't make any sense. I'm sorry? What's the harm? Your Honor, the harm is that no one has to disclose. What's the harm to you? I don't mean, I mean, to Monex. What's the harm? Other people can take pot shots of how our customers do. All right? And they don't have to say anything about how their customers do. FCMs do not disclose track records of their customers. What do you mean by taking pot shots? They can say, look at Monex customers, how they do, although it's non-discretionary accounts. They could take, it's a competitive industry out there, Your Honor. And people, you know, it's brutish, short, and mean. And people take advantage of anything they can to make your competitor look worse. And now we have this law on this. You know, the Fitzgerald case, which they cited, make it clear that you're not entitled to this information unless you are telling the public how your customers do. Otherwise, it is just not relevant. So the question is, the question is, is it relevant and are they entitled to it? And I get back to where I started. Under the purpose and meaning of the Commodity Exchange Act, the Dodd-Frank Amendment, this was decided that Monex was the good guy. All right? Because they followed the model code. They were not supposed to deal with these sorts of litigation. Period. And the CFTC was told by a federal district court judge exactly what they're doing. Okay. Thank you, Mr. Gutierrez. Ms. Stooks? Good morning, and may it please the Court. This is a case in which the CFTC obtained a district court order compelling the appellants to comply with an investigative subpoena. This Court should affirm, and I have two principal points. Point number one, the law of this area is well established. Even when a subpoenaed party objects that it is not covered by the statute in question, the agency is entitled to an order of full compliance with its subpoena, so long as the party's conduct superficially appears to bring it within the coverage of the statute, or worded another way, so long as the party is arguably covered. This case is one in which the district court adopted a magistrate's reporting recommendation to judges in the district court, determined that Monex is indeed arguably or superficially covered by the statute because it does not appear to meet this actual delivery exception. What is your fear that Monex may be doing? There are a couple of things. If we're talking about Section 2C, 2D of the CEA, Monex's business is to purportedly sell precious metals to retail customers using leverage or margin. They loan people the money to buy the metals, and it's a means of speculating on the price of the metal. Under Section 2C, 2D, the Dodd-Frank Act, those kinds of transactions are to be conducted on regulated exchanges that provide for far more protections for retail customers, guarantees, a central counterparty that takes the opposite side of the transaction, and protections in the event of fraud or bankruptcy on the part of the seller. And how does that customer transaction database relate to that? Well, Monex's customer transaction database—oh, why is it relevant? Mm-hmm. It's really— I'm not saying it's totally irrelevant. You don't need that information. We disagree because it's the record of how Monex is purportedly selling these metals. It is the record of how it is managing the positions of the customers, how it is making margin calls. And it has all manner of details about the transactions. That's a tremendous amount of the evidence in the case, is how these transactions are being conducted. It's contained in this computer database. So in order to determine the statutory coverage question, which in this case boils down to Monex's argument that it meets an exception in the statute, one of the things that we talk about in the CFTC's interpretation— interpretive guidance published in the Federal Register is how are the transactions marketed, managed, and performed. And that data is contained in this computer database that we have seen that. This is not a case like the Sidley Austin case, on which Monex relies so heavily, where there can be an easy bifurcation between evidence that's relevant to the statutory coverage question versus evidence that's relevant to maybe underlying violations. For instance, if Monex is engaging in fraud. The database contains information that is relevant to the statutory exception. And what the district court found correctly in this case is that the database was indeed relevant to the statutory coverage question and that the CFTC had established that threshold limited judicial review standard had been satisfied, has been satisfied here, because arguably Monex is not making actual delivery of the metals that it purports to sell. The means by which they claim to deliver metal is to purportedly transfer the quantity of metal to a depository. And then Monex prepares a so-called title document. It sends those title documents to the depository with instructions and addresses for Monex's customers, and then the depository mails the so-called title documents to Monex's customers. In the meantime, the depository and Monex are the only parties that have a contractual relationship. The depositories disclaim any responsibility for the accuracy of information in those title documents. And the title documents, once received by Monex's customers, don't entitle those customers to direct anything to control or possess the metals. They couldn't come or call the depository and say, I have this piece of paper, please FedEx me my ingot of gold. They can't do that. Monex is, in order to physically deliver the metal, the customers have to pay in full, pay off all fees, pay off all loans to Monex, and then Monex has to direct the depository to release the metal to the customer. Why is that a concern of the CFTC? That sounds like an attribute of essentially all forward contracts. If I have a forward contract for petroleum, it won't be released to me unless I pay either in cash or an irrevocable letter of credit. It's not released in the hope that I'll pay in the future. How is Monex's structure different from normal delivery terms of a forward contract? The difference is that Monex's customers never appear to obtain custody or control of the metal when it is purportedly delivered in this way that Monex relies upon. That's a different concern from the one you expressed about delivery not being made until payment in full has occurred. I understand the CFTC to say we have jurisdiction over a situation in which, as a practical matter, trading occurs in the contract rather than trading in the physical good. Thank you. You said it better than I could. That is true. If that's the concern, I understand that, but it's completely different from we don't deliver until we're paid. Maybe they are completely different. What it appears to be is that Monex is conducting this means to speculate on the price of metal, and they are not making actual delivery of metal. Therefore, at this stage, which is just a subpoena enforcement stage, there is an arguable basis that Monex is arguably within the coverage of the CEA. That's all it takes for this Court to affirm the order compelling compliance with the subpoena. To put it another way, for the CFTC to win today, we need to merely establish that the District Court didn't abuse its discretion by finding that Monex is arguably covered by CEA Section 2C2D. For Monex to win, however, it is a much harder bar. Monex has to establish that it's not possible that the CFTC's position on statutory coverage is arguably correct, that they cannot even be said to be arguably covered by the statute or superficially covered by the statute. We submit that that's just not possible for Monex to establish here, where customers who purportedly receive title to metal can't control anything about that metal unless they do something different, unless they actually are engaging in something where they pay in full for the metal. But Judge Easterbrook's question was, if you want to get your gold back from the depository, you have to pay. That's right, but it's not delivered until then. But what? The metal is not delivered until that point. Wait, I can't hear you. Speak louder. Okay. The metal can't... The metal in Monex's method of delivery is arguably not delivered, not actually delivered until the customer pays in full. Yes. Yeah, so... And that's just the way forward contracts work for every commodity you can think of. But whether it's a forward contract or a futures contract, it's covered arguably by Section 2C2D. Forward contracts aren't covered by that statute. CFTC has never, for example, claimed the right to regulate all deliveries in oil, even though you can't pick up your oil without showing the irrevocable letter of credit. You can't pick up your grain, either. But there are forward markets in grain as well as future markets in grain. Yes, but these are not... I thought the CFTC has been clear over the years that it doesn't purport to regulate the forward market in grain. No, the CFTC doesn't regulate forward markets or spot markets, and that's the purpose of that actual delivery exception. But Monex... If you look at the material that's being disputed that Monex wants back, how is that material going to help the CFTC distinguish between the possibilities that Monex is a forward merchant versus a futures merchant? It may demonstrate that no delivery is ever occurring and that this truly is a means just to speculate on the price of metal. So these are not spot transactions. These are not forward transactions. These are just transactions that are financed commodity transactions that are not being conducted on regulated exchanges, and the very purpose of Section 2C, 2D is to put those transactions on a regulated exchange. What I'd like to come back to, though, is that to remand, for instance, as Monex argues, for a determination under Sidley and Austin would be superfluous because the district court here already made the determination that was in issue in the Sidley remand. In the Sidley case, the court remanded to have the district court determine whether the parties were arguably covered by the statute. Here, the district court has already determined that Monex is arguably covered by the statute, that its method of delivery is not actual delivery under the exception to 2C, 2D. There's nothing more for the district court to do there if he were to remand citing Sidley. Can you just address this one argument he made about disclosing this information, that the CFTC will disclose this information and therefore competitors would have access to it? By law, we are certainly not allowed to do that. When we conduct an investigation, our statute requires that information to be kept confidential. So the likelihood of that happening is remote because our statute prevents it, and Monex has been producing information to the CFTC under the subpoena. So are you representing that if a request were filed under the Freedom of Information Act, the CFTC would absolutely not comply? I cannot imagine that it would. That is an exception in the FOIA? That's not the question I asked. Are you representing, on behalf of the CFTC, that if a request is made under the Freedom of Information Act, the CFTC will not comply? The CFTC would answer that FOIA request and say that that information is not disclosable under FOIA because it is investigative material. Well, I think you can see from that answer why Monex is nervous. I don't see why Monex is nervous about that. I did not hear an unequivocal commitment. I don't do the FOIA requests, but I do know that... Have any of Monex customers complained that they had difficulty getting their gold back? Complained to the CFTC? From the depository? Pardon? Have customers come to the CFTC complaining? Well, no, complained to anybody. There are customers who have complained about the amount of money that they have lost trading with Monex. In terms of specific complaints. Well, that's a different point. Yes, it is. Complaints, I don't know. They complained, they wanted their gold back, they couldn't get their gold back. I don't know the answer to that question. But you think that... You think that their right to get the gold back without red tape, without whatever Monex might do to make it difficult for them, you think that is a right that's protected by the Commodity Exchange Act? Is that protected under the rubric of actual delivery? I may not understand your question. I think what's protected by the... Well, you say that what you're concerned about is that Monex may not be giving customers... It's not allowing the customers to have control to which they're entitled over the gold, get the gold back. My question is whether that concern of yours is rooted in something in the Commodity Exchange Act itself. Let me clarify that the agency's concern is that these transactions are being conducted off exchange, just these bilateral transactions, where there are opportunities for customers to be harmed without the protections that a regulated exchange... So is it illegal, these off exchange trades? Is that illegal? It is, unless you're making actual delivery, yes. Yes, it is. And you say they're not making actual delivery because the customers have no direct relationship with the depository? I'm saying... Is that the concern? That's one of the factors that goes into our concern. I'm saying that they do not, arguably, do not meet that exception from statutory coverage because it appears that Monax's method of delivery, which involves this pass-through mailing of a title document, doesn't get the customer anything except for confirmation of its trading position in Monax's computer system. And with the Court's indulgence, can I come back to this forward contract issue that Judge Easterbrook raised? Because I'm afraid I may have left the record unclear. Well, wait a second, you're losing me. So you're saying no actual delivery? Is that your point? I'm saying arguably... The statute requires actual delivery, and you're concerned that, you're not certain, but you're concerned that maybe there's no actual delivery here? What I'm saying is that they are within, arguably within the statutory coverage to affirm the District Court's ordering full compliance with the statute because arguably they're not accepted. No, my question is, is actual delivery the concern? That there may not be actual delivery within the meaning of the statute. You don't know whether there is or is not, but that's your concern. That's why you want the information. Is that correct? No, I don't want to irritate Your Honor. Yes, it is a concern because it is a statutory exception. It's an affirmative defense, so it's something that we're investigating. If they need actual delivery, they're not within the statute, and we might lose if we bring an enforcement case. Okay. Okay, well, thank you, Ms. Dukes. Thank you very much. Mr. Gottheiner, I think your time expired, but you can have another minute or so. Okay. Thank you very much, Your Honor. First of all, to answer your question, in 30 years, and this is undisputed, there's never been a customer suggesting that the metal wasn't delivered. It's never happened. That's number one. Number two, the title document is more than just that there was a purchase. The title document says the title has passed to the customer and it's been actually delivered to the depository. So just to be clear on that, it's in the papers, but I'm sure counsel inadvertently made a mistake on that. With respect to any of it, there is no arguable basis. Once they have admitted, and they did to Magistrate Judge Schenker, that they're not saying that the metal is not actually delivered to the depository, it means there's no arguable. There's no argument anymore. And, in fact, they rely on Magistrate Judge Schenker's analysis, but he never suggested any fact at all. And he certainly didn't adopt their security transaction regime as being a basis for there being no actual delivery. All he did was refer to the Hunter Weiss case, and unfortunately, although he acknowledged that that was another situation, he used the word constructive to say that he found that there may be constructive delivery. But he didn't indicate where or why, and furthermore, in terms of finding coverage, he made a mistake. He ignored Zellner. And Zellner makes it real clear the fact that there is a remedy under Section 2 doesn't at all mean that there is anything close to jurisdiction or coverage. So with respect to all those issues, I just wanted to clarify. And finally, with respect to answering, I think it was your question, Judge Posner, is there any link between anything in the customer track record and the question of actual delivery as Congress defined it? She did not give you an answer. The fact that anything could happen, that anything is a possibility, that something may be there, as Zellner pointed out, is not enough. There has to be some reasoning. And so far, in all the papers, and also before Judge Hanker, and also before this Court, they have not suggested any link, any connection, anything that would suggest there is any relationship between customer track records and of what Congress said, actual delivery exempts. They are totally nullifying the exemption. Thank you very much, Mr. Gertiner and Ms. Stokes.